**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION**

| | |
|---|---|
| STRUCTIS CONSTRUCTION SOLUTIONS GROUP, LLC, Plaintiff<br><br>v.<br><br>ANDREW PUPKE, an individual; DANIEL HAIDET, an individual; and DNA POLYMER FLOORING INC., a Florida corporation, Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Structis Construction Solutions Group, LLC ("Plaintiff," "Structis," or the "Company"), by and through its undersigned counsel, files this Complaint against Defendants Andrew Pupke ("Pupke"), Daniel Haidet ("Haidet"), and DNA Polymer Flooring Inc. ("DNA Polymer," collectively with Pupke and Haidet, "Defendants"). In further support, Plaintiff states as follows:

## PRELIMINARY STATEMENT

1. This case is about two trusted senior managers who secretly conspired to steal their employer's business while collecting salaries, bonuses, and benefits from that very employer. While still on Structis' payroll and getting paid management-level salaries, Defendants Pupke and Haidet created a competing company, DNA Polymer Flooring Inc., to compete with Structis in the same market and in the same line of business. They then systematically

looted Structis' customer relationships, confidential business information, personnel, and business opportunities, all while lying to Structis management about what they were doing.

2. Pupke was the Division Sales Manager and the face of Structis' Tampa operation. He controlled the Company's customer relationships, pricing information, project data, and vendor contacts in the region. Haidet was the Division Manager who oversaw field operations, including scheduling, project execution, and crew management. Together, they held the keys to Structis' Florida business and had unfettered access to its most sensitive confidential information and trade secrets.

3. Beginning no later than June 2025, while both were still employed by Structis and receiving full compensation, Pupke and Haidet secretly formed DNA Polymer. When confronted with rumors of a competing venture, Pupke lied—repeatedly and deliberately. He denied forming any competing company. He assured his supervisor of his ongoing loyalty. When he finally admitted by text message that he had lied, he doubled down, assuring the Company that he had no intention of competing. He sought a waiver of his non-compete, was told no, and assured the Company he would abide by his obligations. He did not.

4. Instead, Pupke used his remaining months at Structis to position DNA Polymer for a seamless launch at Structis' expense. He dismissed the

office manager, took exclusive control of all operations, and upon his departure left the office stripped of useful records—phones unplugged, the whiteboard erased, purported leads that were dead ends, and a backlog of work that had mysteriously vanished. Structis' multimillion-dollar Florida operation was methodically gutted from the inside by the very people entrusted to run it.

5. Since Pupke's departure on November 30, 2025, Defendants have operated DNA Polymer in direct competition with Structis, soliciting Structis' customers, using Structis' vendors, hiring Structis' field crews, and leveraging Structis' confidential information and trade secrets—all in flagrant violation of Pupke's Employee Nondisclosure, Noncompetition, Nonsolicitation and Inventions Agreement, Haidet's contractual obligations, their common law fiduciary duties, and federal and state trade secret laws.

6. Structis estimates its losses in excess of $2,000,000 and growing daily as Defendants continue their unlawful conduct. This action seeks to hold all Defendants accountable, to recover compensatory, consequential, and punitive damages, and to obtain injunctive relief to prevent further irreparable harm to the Company.

**PARTIES, JURISDICTION, AND VENUE**

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises, in part, under federal law—specifically, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., and

the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this District.

9. At all relevant times, Structis operated its Tampa, Florida facility in this District.

10. At all relevant times, Defendants Pupke and Haidet were employed at and worked from Structis' Tampa, Florida facility.

11. Defendant Pupke resides in Largo, Florida, which is located within this District.

12. Defendants formed and operate DNA Polymer in this District, and its principal place of business is located in this District.

13. Defendants misappropriated trade secrets and confidential information in this District and misappropriated trade secrets and customer relations in other states.

14. Defendants solicited Structis customers, potential customers, and employees in and around this District.

15. Plaintiff Structis Construction Solutions Group, LLC is a Minnesota limited liability company with its principal place of business in

Minnesota and operations including a facility in Tampa, Florida. Structis is engaged in the business of designing, manufacturing, selling, installing, distributing, servicing, providing consulting, evaluation, inspection, and other services related to epoxy flooring and polished concrete flooring, resinous flooring, commercial and industrial flooring, and related applications.

16. Defendant Andrew Pupke is an individual who, upon information and belief, resides in Largo, Florida. Pupke was formerly employed by Structis as Division Sales Manager at its Tampa, Florida facility.

17. Defendant Pupke is subject to the jurisdiction of this Court because he: (1) resides in Florida; (2) committed tortious acts within this District; (3) violated Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq.; (4) misappropriated trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (5) violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (6) violated the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 et seq.; (7) committed civil theft in this District; and (8) entered into a contract with a Florida Company that was to be performed, in substantial part, in this District.

18. Defendant Daniel Haidet is an individual who, upon information and belief, resides in Bradenton, Florida. Haidet was formerly employed by Structis as Division Manager at its Tampa, Florida facility.

19. Defendant Haidet is subject to the jurisdiction of this Court because he: (1) resides in Florida; (2) committed tortious acts within this District; (3) violated Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq.; (4) misappropriated trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (5) violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (6) violated the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 et seq.; (7) committed civil theft in this District; and (8) entered into a contract with a Florida Company that was to be performed, in substantial part, in this District.

20. Defendant DNA Polymer Flooring Inc. is a Florida corporation formed by Defendants Pupke and Haidet with its principal place of business in Florida.

21. Defendant DNA Polymer is subject to the jurisdiction of this Court because it: (1) is incorporated in Florida; (2) maintains its principal place of business in this District; (3) committed tortious acts within this District; (4) violated Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq.; and (5) misappropriated trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

## FACTUAL BACKGROUND

### *Structis and Its Business*

22. Structis offers a comprehensive array of resinous and epoxy flooring services, including the design, manufacture, sale, installation, distribution, servicing, consulting, evaluation, and inspection of epoxy flooring, polished concrete flooring, resinous flooring, commercial and industrial flooring, restaurant flooring, residential epoxy garage flooring, and manufacturing and industrial flooring applications.

23. Structis has invested substantial time, money, and resources developing its goodwill, customer and vendor relationships, proprietary processes, pricing methodologies, and business strategies. Through its predecessor entities, including the Gillespie Group which was acquired in 2018 and had been in operation for over 30 years, Structis and its predecessors have built customer and business relationships spanning over several decades. These investments have enabled Structis to build a competitive advantage in the flooring market in the Southeast, Midwest, and other regions.

### *Structis' Confidential Information and Trade Secrets*

24. Structis keeps confidential numerous types of information, including, but not limited to:

- Customer identities, requirements, specifications, and contact information;

- Potential customer identities and project pipelines;
- Pricing strategies, bid amounts, and cost structures;
- Project-specific data and specifications;
- Vendor and supplier relationships and pricing;
- Bidding strategies and estimating methodologies;
- Business forecasts and strategic plans;
- Employee compensation and personnel information;
- Operational processes, techniques, and methods;
- Proprietary formulations, blends, and application methods; and
- Financial information, including revenue, margins, and profitability by project and region.

25. Structis' trade secrets include but are not limited to: customer lists and relationships developed over decades of work in the industry, pricing methodologies refined through years of competitive experience, bid strategies that give Structis a competitive edge, vendor relationships and negotiated terms, estimating processes developed through substantial investment of time and resources, proprietary installation techniques and quality control methods, and business expansion plans.

26. Structis has spent years developing its proprietary pricing methodology, customer relationships, and operational expertise, resulting in an enhanced position in the marketplace and a significant competitive

advantage. Structis' competitive advantage stems from years of building customer and vendor relationships, developing specialized processes, and recruiting and retaining accomplished managers—like Pupke and Haidet—who were trained and trusted by Structis to help the Company reach its potential in the Florida market. Defendants exploited this trust and the access it provided to steal Structis' competitive advantage for themselves.

27. Structis has taken significant and reasonable measures to maintain the confidentiality of its proprietary information and trade secrets, including but not limited to:

- Requiring employees who will have access to trade secret or confidential information to sign nondisclosure, noncompetition, and nonsolicitation agreements, or to acknowledge confidentiality obligations as part of their employment terms;
- Storing confidential information on password-protected software and systems;
- Limiting access to certain confidential information on a "need to know" basis;
- Locked offices and physical security systems, including document and filing systems;
- Electronic and computer security measures including firewalls, encryption, and password protection protocols;

- Employees receive training regarding confidentiality obligations;
- Requiring employees to sign employee handbooks and company policies that include clauses regarding the confidentiality of Company information.

28. The information, methods, and techniques developed by Structis, including, but not limited to, customer and vendor relationships, pricing and estimating methods, project management processes, and market-specific knowledge, constitute highly confidential, proprietary, and trade secret information not generally known in the public domain. That information has significant economic value to Structis and would be of significant economic value to competitors in the industry—as demonstrated by Defendants' misappropriation and use of this very information to launch a competing business.

29. Only certain Structis employees are allowed access to Structis' trade secrets and confidential information. Anyone who receives access to such information must abide by confidentiality obligations. Employees with access to sensitive information are required to acknowledge and agree to confidentiality obligations through their employment agreements, offer letters, or employee handbooks.

***Pupke's Employment and Restrictive Covenant Agreement***

30. Pupke was employed by Structis in a senior management capacity as the manager of the Company's Tampa facility. Effective November 1, 2022, Pupke received a promotion to Division Sales Manager, with a salary increase to $135,000 per year, a starting bonus of $50,000, and an annual bonus opportunity based on a percentage divisional operation income.

31. Pupke's responsibilities included, among other duties, growing the resinous coatings group in Florida, managing customer and potential customer relationships, developing bids and proposals, overseeing field operations, and serving as the Company's principal representative to customers and contractors in the Tampa and Southeast region.

32. In consideration for his promotion, salary increase, starting bonus, and annual bonus—and as a condition of his continued employment—Pupke executed an Employee Nondisclosure, Noncompetition, Nonsolicitation and Inventions Agreement (the "Pupke Agreement") on November 10, 2022. A true and accurate copy of the Pupke Agreement is attached as **Exhibit A**.

33. In the Pupke Agreement, Pupke acknowledged and agreed that he had access to, and would develop, substantial and valuable business relationships with the customers, prospective customers, and business partners of the Company, and that the Company had a legitimate interest in

preserving those business relationships and in protecting its confidential, proprietary, and trade secret information.

34. **Confidentiality.** Under Section 2 of the Pupke Agreement, Pupke agreed that during employment and at all times thereafter, he would not, directly or indirectly, use, access, disclose, photograph, copy, duplicate, or create images of any Confidential Information and Materials of the Company, except as expressly authorized by the Company or reasonably required in the performance of his duties.

35. The Pupke Agreement defines "Confidential Information and Materials" to include, among other things: information relating to proprietary rights and data, trade secrets, inventions, technology, processes, formulae, customer identity (including potential customers), requirements and specifications of customers and potential customers, contracts with customers, pricing and purchasing information, business strategies and goals, financial information, employee information, and vendor and subcontractor information.

36. **Return of Property.** Under Section 3 of the Pupke Agreement, Pupke agreed that upon his separation from employment, he would immediately return to the Company all property, documents, files, correspondence, emails, reports, materials, and all copies thereof, belonging to the Company or relating to its business. The Agreement further provided that Pupke would not destroy or retain any such Company Property, and that in

the event any Company Property was stored on any electronic or storage device, Pupke would make such device available for inspection by the Company.

37. **Work Product and Inventions.** Under Section 4 of the Pupke Agreement, Pupke acknowledged that all work product created during his employment, including designs, formulae, software, and drawings, would be the sole and exclusive property of the Company.

38. **Noncompetition.** Under Section 5(b) of the Pupke Agreement, during the one-year Noncompetition Period immediately following his last date of employment, Pupke agreed that he would not, directly or indirectly, in any capacity, own, develop, manage, operate, join, control, consult for, participate in the ownership, development, operation, or control of, or be employed by, lend assistance to, or otherwise render services with respect to the Business, to any person or entity engaged in the Business in the Geographic Area (defined as "the geographic area in which the Company has conducted business at any time during the two (2) year period immediately preceding Employee's last date of employment"). The Geographic Area includes at least Florida, Georgia, and Alabama and also includes and other southeastern states where Structis has conducted business.

39. **Nonsolicitation.** Under Section 5(c) of the Pupke Agreement, during the one-year Nonsolicitation Period immediately following his last date of employment, Pupke agreed that he would not, directly or indirectly:

a) Contact or solicit any Customer for the purpose of diverting that Customer's business from the Company or providing competing products or services to that Customer;

b) Induce or persuade any Customer or other person doing business with the Company to limit, alter, or terminate its relationship with the Company;

c) Contact or solicit any Potential Customer for the purpose of diverting that Potential Customer's business from the Company;

d) Induce or persuade any Potential Customer to limit, alter, or terminate its relationship with the Company; or

e) Hire, retain, or attempt to hire or retain any employee, consultant, or contractor of the Company, or influence or solicit any such person to leave or terminate employment with the Company.

40. **Notification.** Under Section 5(d) of the Pupke Agreement, during the Noncompetition and Nonsolicitation Periods, Pupke was required to inform any future employer or contractor of his restrictions and obligations and to provide a copy of the Agreement in advance of any hire or engagement. Pupke

was also required to provide the Company with written information regarding any future employer or business endeavor.

41. **Injunctive Relief.** Under Section 6 of the Pupke Agreement, Pupke acknowledged and agreed that the provisions of the Agreement are reasonable and necessary to protect the legitimate business interests of the Company, that any breach or threatened breach would cause irreparable harm, and that the Company would have no adequate remedy at law. Pupke further consented to the issuance of injunctive relief in the event of a breach or threatened breach.

42. **Governing Law.** Under Section 7 of the Pupke Agreement, Pupke agreed that it would be governed by "the laws of the state in which Employee is based for the Company during the last year of Employee's employment, or the majority of the last year of Employee's employment," which is the law of the State of Florida.

43. **DTSA Notice.** The Pupke Agreement contains a notice pursuant to the federal Defend Trade Secrets Act of 2016 ("DTSA"), reflecting the understanding that federal trade secret protections apply to the Company's trade secrets.

***Haidet's Employment and Restrictive Covenants***

44. Haidet was employed by Structis in a management capacity as Division Manager at the Company's Tampa, Florida facility. Effective

November 1, 2022, Haidet received a promotion to Division Manager, a base salary of $120,000 per year, a promotional bonus of $15,000, a starting bonus of $12,500, and an annual bonus opportunity based on a percentage of the divisional operation income. Haidet executed the offer letter on November 7, 2022. A true and accurate copy of Haidet's executed offer letter is attached as **Exhibit B**.

45. As a condition of his employment, Haidet's signed offer letter contained express restrictive covenants providing that:

a) Haidet agreed not to engage in any other gainful employment, business, or activity without the written consent of the Company that competes directly or indirectly with the Company;

b) Haidet would not assist any person or organization in competing with the Company, in preparing to compete with the Company, or in hiring any employees of the Company.

46. As senior executives occupying management positions with significant responsibility and autonomy, both Pupke and Haidet were fiduciaries of Structis and owed fiduciary duties to the Company. Pupke and Haidet owed fiduciary duties of care, honesty, good faith, and undivided loyalty to Structis. As fiduciaries, they were not permitted to use their position of trust and confidence to further their own interests at the Company's expense, to compete with the Company while employed, to secretly divert business

opportunities, or to misappropriate the Company's confidential information and trade secrets.

***Defendants' Scheme to Steal Structis' Business***

47. While still employed by Structis and receiving compensation as senior managers—including base salaries, bonuses, and benefits—Defendants Pupke and Haidet secretly incorporated DNA Polymer in approximately June 2025. Upon information and belief, DNA Polymer was created for the express purpose of competing with Structis in the identical geographic market and offering identical flooring services.

48. Upon information and belief, Pupke and Haidet began planning and preparing to compete with Structis well before June 2025, while being paid as management-level employees. As early as May 2025, industry vendors and contacts became aware of discussions by Pupke and Haidet about setting up credit applications with vendors and forming a new venture. Haidet was actively getting DNA Polymer up and running while still employed by and collecting a salary from Structis, before eventually leaving once DNA Polymer's operations were underway.

***Pupke Repeatedly Lies to Structis***

49. As early as May 2025, Robert Owens, Structis' Southeast Vice President, received information from Todd Ritter, a contact in the industry, that Pupke and Haidet were talking to vendors and discussing setting up credit

applications in connection with a new business venture. Owens contacted Pupke to check in and to ensure that Pupke was committed to Structis. Pupke assured Owens that everything was great and that he was happy in his position. Pupke stated that he was satisfied in his position and had no reason to leave. This assurance was false—Pupke was already actively planning the formation of DNA Polymer.

50. In July 2025, Todd Ritter again contacted Owens, this time reporting that Haidet had directly told Ritter that he and Pupke were looking to make a move in two months, but Defendants did not provide further details.

51. Owens called Pupke and told him he had received word that Pupke and Haidet were planning to leave. Pupke vehemently denied the accusation, claimed someone was spreading rumors and lies, and again assured Owens of his loyalty.

52. Owens subsequently discovered through a search of the Florida Secretary of State's records that Pupke and Haidet had indeed formed DNA Polymer. Owens texted Pupke and asked him to call, without disclosing the reason. Owens confronted Pupke directly about DNA Polymer. Pupke initially denied any knowledge. Later that same day, Pupke sent Owens a text message admitting that he had lied and stating he was sorry for not telling Owens the truth during their prior conversations. A true and accurate copy of this text exchange is attached as **Exhibit C**.

53. In subsequent discussions, both during the remainder of Pupke's employment and thereafter, Pupke repeatedly assured Owens that he was not, and had no intention of, competing with Structis and that he was merely doing office work for his new company, which Pupke claimed was not competitive with Structis.

54. In October 2025, Pupke asked if he could contact the Chief Financial and Operating Officer, Michael Berry, to seek a waiver of his contractual obligations. Owens followed up and informed Pupke that the Company would not waive those obligations. Pupke again assured Owens that he would abide by his contractual obligations.

55. Despite Pupke's repeated assurances, the Company could not, given his deceptive actions, continue to employ him. Owens communicated to Pupke that he would need to leave Structis but that the Company needed his assistance in the transition while the Company hired a replacement.

***Pupke Sabotages the Transition.***

56. Pupke was the face of Structis in the Tampa area and had kept the Company's customers, potential customer information, and contacts essentially within his sole purview.

57. Pupke claimed he was committed to assisting Structis in the transition, including with respect to a government contract at Hunter Army Airfield in Georgia. Pupke repeatedly assured the Company that he was not

engaging in competitive activity and that he would abide by his contractual obligations.

58. With respect to the government contract, Pupke convinced Owens that the customer relationship would suffer if Pupke did not handle transition matters. The Company thus in good faith retained and compensated Pupke for these transition activities.

59. During his last period of employment with the Company, Pupke told the office manager that the office manager need not report to work and could work from home, and Pupke proceeded to control all activity for the remainder of his employment.

60. Pupke also purchased equipment from Structis during this time while consistently assuring the Company that he was not engaging, and would not engage, in competitive activity. Pupke represented that the equipment would not be used to compete with Structis. Upon information and belief, this representation was false, and Pupke obtained the equipment under false pretenses for use in his competing business.

61. Pupke's last date of employment with the Company was November 30, 2025.

***Pupke Leaves the Office Gutted***

62. Upon Pupke's departure, his successor, Chris Courtney, found the office and records left in a state essentially without value, void of pertinent

information relating to running a resinous flooring company. Phones were unplugged, the whiteboard was erased clean, and there appeared to be no indication of a viable backlog—extremely unusual for a company that had generated millions of dollars in revenue the previous year. The office had been deliberately stripped of the information necessary to operate the business.

63. Purported leads that Pupke had relayed as being in play for the Company proved to be dead ends. Bids and work in process that had been communicated to be in the pipeline disappeared, and business that the Company regularly handled appears also to have evaporated. Upon information and belief, Defendants diverted these business opportunities to DNA Polymer.

64. Moreover, upon information and belief, Pupke took deliberate steps to destroy evidence of his activities on Company systems. A forensic investigation of Pupke's Company-issued laptop revealed that CCleaner—a program commonly used as an anti-forensics tool to wipe data and user activity from a computer—had been downloaded to Pupke's user profile and was executed at least once on or around July 21, 2025, during the period when Pupke was actively planning and forming DNA Polymer. The use of such a program was inconsistent with the normal operation of the Company, which outsources IT management to a third-party vendor. Upon information and belief, Pupke installed and ran CCleaner to destroy evidence of his

misappropriation and competitive activity. The forensic examination further revealed that Pupke's user account was only partially intact, with fewer than ten files remaining and the majority of the user profile no longer in existence. The investigation continues.

***Defendants Openly Compete with Structis After Pupke's Departure***

65. Since his departure, Pupke has actively and openly competed with Structis through DNA Polymer—all in direct violation of the Pupke Agreement. Defendants have solicited and performed work for the same customers, used the same vendors, and hired former Structis field crew members, all while leveraging Structis' confidential information and trade secrets.

66. In early 2026, an order confirmation from Fiberglass Coatings, Inc.—a vendor used by Structis—was inadvertently sent to Pupke's former Structis email address, revealing that Pupke was actively purchasing materials for competing work from Structis' own supplier. The order, totaling $1,889.15, was for UV Epoxy and Stone materials shipped to DNA Polymer at its Bradenton, Florida address. A true and accurate copy of the email inadvertently sent to Pupke's former Structis email address along with the order is attached as **Exhibit D**.

67. Moreover, David Nelson Construction Co.—a long-time Structis customer—issued a purchase order to DNA Polymer for $13,650 for epoxy

flooring work at the Manatee Rescue Center for a Tampa zoo project. This purchase order was also inadvertently sent to Pupke's former Structis email address. Structis had just completed work for another Tampa zoo project with David Nelson Construction, confirming that Pupke was actively soliciting and performing work for Structis' own customers. A true and accurate copy of this email and purchase order inadvertently sent to Pupke's former Structis email address is attached as **Exhibit E**.

68. Upon information and belief, Defendants are performing work for Costco through a contractor called DTI, which has been a specific long-time client of Structis. Haidet was engaged with Costco work while he was still employed by Structis and, upon information and belief, was performing work for DNA Polymer on Costco projects simultaneously. The transition of Costco work from Structis to DNA Polymer went unusually smoothly, with no apparent gap in service—suggesting that Defendants had orchestrated the diversion of this business before their departures. A former Structis employee who went to work for Pupke and subsequently sought to return to Structis confirmed that DNA Polymer was working on a Costco project near Clearwater, Florida.

69. Upon information and belief, Defendants Pupke and Haidet have solicited and hired multiple members of Structis' field crew. The Company has lost personnel who are believed to be working for DNA Polymer. Following

Haidet's departure, crews of Structis field employees departed in rapid succession immediately following Pupke's and Haidet's departure and, upon information and belief, were working for DNA Polymer before fully leaving Structis. Eleven employees left and were confirmed to be working for Defendants. One of the departing employees, Jacques Davis, asked to come back to Structis—confirming he was working for Defendants.

70. Additionally, at some point during his employment, Pupke began a campaign of directing customers and contacts to call him on his personal cellular telephone rather than his Company-issued work phone. Pupke changed his email signature on Company correspondence to display his personal cell phone number instead of his Company-issued work number, in order to transition Company client relationships to his personal contact information and away from Structis' systems in anticipation of his departure and the launch of DNA Polymer.

***Structis' Losses***

71. The Company has conducted a review of its records and estimates that it has suffered losses in excess of $2,000,000 already as a direct and proximate result of Defendants' wrongful conduct, and these losses continue to grow. These losses include lost revenue, lost customers, lost business opportunities, lost personnel, the cost of recruiting and training replacement

employees, damage to the Company's goodwill and competitive position, and the diminution in value of Structis' Florida operations.

72. In early 2026, through counsel, the Company sent Pupke a formal cease-and-desist letter demanding that he and all those in his new entity cease all solicitation of Company personnel and customers, respect his obligations under the Pupke Agreement and applicable law, and immediately return all Company property. A true and accurate copy of the Company's cease-and-desist letter to Pupke is attached as **Exhibit F**.

73. Pupke retained counsel, and settlement negotiations followed. The parties exchanged proposals, but Pupke's responses failed to address the Company's concerns or his violations to date. The parties failed to reach an agreement.

74. On June 29, 2026, Structis' counsel, Anne Radolinski, sent a written pre-lawsuit demand under Fla. Stat. § 772.11 by email to Ashwin Trehan, Esq., counsel for Defendants. Mr. Trehan confirmed he represented all Defendants and was authorized to accept service of the complaint. Based on the Company's estimate of actual damages exceeding $2,000,000, the demand sought payment of the treble-damage amount of at least $6,000,000 within thirty (30) days of receipt, and stated that, upon full compliance, Structis would provide the release required by Fla. Stat. § 772.11. The correspondence also notified Defendants of their obligation to preserve

evidence. A true and accurate copy of Structis' pre-lawsuit demand with confidential settlement discussions redacted is attached as **Exhibit G**.

75. More than thirty (30) days have passed since Defendants received the pre-lawsuit demand, and none of the Defendants has complied with it.

76. In fact, Defendants' violations did not stop after the notice. Despite the Company's cease-and-desist letter and subsequent communications, Defendants have continued to compete with Structis and to solicit and perform work for its customers and potential customers in the Geographic Area during the restricted periods, in violation of the Pupke Agreement and Haidet's restrictive covenants. Many customers and contractors have contacted Structis directly to report this activity and have disclosed contracts they entered into with Defendants for flooring work during the restricted periods—contracts that Defendants entered into knowing the work violated their restrictive covenants.

77. Defendants' wrongful conduct is ongoing and continues to cause irreparable harm to the Company each day. The full extent of Defendants' illegal conduct is still under investigation.

***The Need for Permanent Injunctive Relief***

78. Defendants are engaged in an ongoing scheme to misappropriate Structis' trade secrets and confidential information, and to unlawfully compete with Structis through improper means. As a result of Defendants' misconduct,

Defendants have obtained critical confidential proprietary information that, if continued to be used, will further destroy Structis' competitive position, provide significant competitive advantage to DNA Polymer, and cause irreparable harm to Structis that cannot be adequately compensated by money damages alone.

79. Given the direct competition in the same market and the revenue at stake, Defendants' unlawful actions are causing and will continue to cause great and irreparable harm to Structis' business, which cannot adequately be remedied by an award of monetary damages alone.

80. Absent an injunction requiring Defendants to stop their unlawful conduct and to account for and return Structis' confidential information and trade secrets, Structis will continue to be irreparably injured.

81. Defendants have demonstrated the means and willingness to misuse Structis' confidential information, misappropriate its trade secrets, and use and distribute its proprietary information without authorization.

82. Structis has a legitimate and protectable business interest in its trade secrets and confidential information, goodwill, employee relationships, and in its current and prospective business relationships. Florida recognizes these as legitimate business interests under Fla. Stat. § 542.335.

83. Without this Court's intervention, there is a real, present, and continuing threat that Defendants will wrongfully use or disclose Structis'

confidential information and trade secrets, including its customer identities, pricing methodologies, project data, and vendor relationships, in ongoing competition with Structis.

84. The entry of an injunction would further the public interest by ensuring that Defendants' misconduct and misappropriation stops.

85. The hardship to Structis outweighs any potential harm that Defendants would incur by issuance of such an injunction. Defendants can easily refrain from their wrongful conduct and account for and return Structis' proprietary information.

86. Structis is entitled to permanent injunctive relief. Indeed, Pupke agreed "that the provisions of Sections 2, 3, 4, 5, and 6 of this Agreement are reasonable and necessary to protect the legitimate business interests of the Company" and that the Company "will be entitled, in addition to any other remedy it may have at law or in equity, to an injunction enjoining or restraining Employee from any violation or violations of this Agreement."

**COUNT I — BREACH OF CONTRACT (PUPKE AGREEMENT)**
**(Against Defendant Andrew Pupke)**

87. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

88. The Pupke Agreement is a valid contract between the Company and Pupke.

89. Pupke acknowledged and agreed to the Pupke Agreement and its restrictive covenants, including the noncompetition, nonsolicitation, nondisclosure, and return-of-property provisions, by signing and executing the Pupke Agreement and accepting an employment promotion and increased compensation.

90. The restrictive covenants in the Pupke Agreement are reasonable in duration (one year), geographic scope (the geographic area in which the Company conducted business, including Florida and other southeastern states), and scope of activity (the Business as defined in the Agreement), and are supported by adequate consideration including Pupke's promotion, salary increase, signing bonus, annual bonus opportunity, and continued employment.

91. Structis has performed all necessary conditions precedent to this action, or such conditions have been waived or excused.

92. Pupke has materially breached the Pupke Agreement, and has willfully and intentionally continued to do so after receiving written notice of his obligations and breaches, by, among other things:

a) Breaching Section 5(b) (Noncompetition) by owning, operating, and rendering services to DNA Polymer, a competing business engaged in the same Business in the same Geographic Area, during the Noncompetition Period;

b) Breaching Section 5(c)(i)–(vi) (Nonsolicitation of Customers and Potential Customers) by contacting, soliciting, and performing work for Customers and Potential Customers of the Company, including Fiberglass Coating Inc., David Nelson Construction Co., DTI/Costco, and others;

c) Breaching Section 5(c)(vii) (Nonsolicitation of Employees) by hiring, retaining, and soliciting employees of the Company to leave their employment, including Haidet and at least ten other employees and field personnel;

d) Breaching Section 5(d) (Notification) by failing to inform Structis of his business endeavor with DNA Polymer and failing to provide the Company with the written information required under the Agreement;

e) Breaching Section 2 (Confidential Information) by using and disclosing Confidential Information and Materials, including customer identity, pricing, bidding information, and project-specific data, to compete with the Company;

f) Breaching Section 3 (Return of Property) by failing to return Company Property, including documents, files, records, and other materials; and

g) Breaching Section 4 (Work Product and Inventions) by failing to assign and return all Work Product and Intellectual Property Rights created during his employment.

93. As a direct and proximate result of Pupke's breaches, Structis has suffered and continues to suffer damages in excess of $2,000,000, including but not limited to lost revenue, lost customers, lost business opportunities, and lost personnel, the exact amount of which shall be determined at trial.

**COUNT II — BREACH OF CONTRACT (HAIDET OFFER LETTER)**
**(Against Defendant Daniel Haidet)**

94. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

95. Haidet's signed offer letter constitutes a valid and enforceable contract between Structis and Haidet, containing express restrictive covenants prohibiting Haidet from engaging in competing employment or business without written consent, and from assisting any person or organization in competing with the Company or hiring employees of the Company.

96. Structis has performed all necessary conditions precedent to this action.

97. Haidet has breached the restrictive covenants contained in his offer letter, and has willfully and intentionally continued to do so after receiving notice of his obligations and breaches, by:

a) Co-founding and operating DNA Polymer, a business that competes directly with Structis, without the written consent of the Company;

b) Assisting Pupke and DNA Polymer in competing with the Company and in preparing to compete with the Company; and

c) Participating in the hiring of Structis employees.

98. As a direct and proximate result of Haidet's breaches, Structis has suffered and continues to suffer damages, the exact amount of which shall be determined at trial.

**COUNT III — BREACH OF FIDUCIARY DUTIES**
**(Against Defendants Andrew Pupke and Daniel Haidet)**

99. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

100. As Structis' former executives occupying senior management positions with significant authority, responsibility, and autonomy, Defendants Pupke and Haidet enjoyed a position of trust and confidence at Structis and thus owed fiduciary duties to the Company. At all relevant times, Pupke and Haidet were Structis' agents during their employment, and Structis reposed trust and confidence in them to act in the Company's best interests.

101. During their employment with Structis and their roles as Division Sales Manager and Division Manager, respectively, Defendants Pupke and

Haidet owed fiduciary duties of loyalty, due diligence, care, good faith, and confidentiality to Structis. These duties prohibited Defendants from competing with Structis while employed, diverting corporate opportunities, misappropriating confidential information, and placing their personal interests ahead of the Company's interests.

102. Defendants Pupke and Haidet breached their fiduciary duties of loyalty by acting as disloyal 'double agents' during their employment with Structis, secretly incorporating and building a competing business while continuing to receive salaries, bonuses, and benefits from Structis, and while affirmatively misrepresenting their loyalty to the Company.

103. Defendants Pupke and Haidet further breached their fiduciary duties by:

a) Incorporating DNA Polymer in approximately June 2025 while still employed by and receiving compensation from Structis;

b) Soliciting business and customers of Structis while still employed;

c) Stealing Structis' confidential information and trade secrets and using them to compete with Structis;

d) Concealing their competing activities from Structis management through a series of blatant and deliberate misrepresentations;

e) Putting their personal interests above the interests of the Company;

f) Failing to disclose their relationship with DNA Polymer and their self-interest during employment;

g) Self-dealing, including the purchase of Company equipment under false pretenses;

h) Removing, concealing, or destroying Company records, data, and information during their employment; and

i) Failing to act in good faith and fair dealing, including sabotaging the transition to Pupke's successor.

104. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Structis has suffered and continues to suffer damages, the exact amount of which shall be determined at trial.

**COUNT IV — AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES**
**(Against Defendant DNA Polymer Flooring Inc.)**

105. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

106. As Structis' former executives, Defendants Pupke and Haidet owed fiduciary duties to Structis, including fiduciary duties of loyalty, care, and confidentiality. DNA Polymer was aware of the fiduciary duties that Pupke and Haidet owed to Structis.

107. Pupke and Haidet breached their fiduciary duties to Structis as alleged herein.

108. DNA Polymer, as the corporate vehicle through which Pupke and Haidet carried out their scheme, knowingly induced, encouraged, and aided and abetted Pupke's and Haidet's breaches of their fiduciary duties by, among other things:

a) Serving as the entity through which Pupke and Haidet competed with Structis while still employed;

b) Receiving and using Structis' confidential information and trade secrets;

c) Soliciting and hiring Structis employees; and

d) Soliciting and performing work for Structis customers.

109. DNA Polymer provided substantial assistance and encouragement to Pupke and Haidet in committing their breaches of fiduciary duty.

110. As a direct and proximate cause of DNA Polymer's misconduct, Structis has suffered and will continue to suffer damages and irreparable harm.

**COUNT V — MISAPPROPRIATION OF TRADE SECRETS UNDER FLORIDA'S UNIFORM TRADE SECRETS ACT (FLA. STAT. §§ 688.001–688.009)**
**(Against All Defendants)**

111. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

112. Defendants Pupke and Haidet acquired trade secret information from Structis through their employment positions with the Company. This trade secret information includes information pertaining to Structis' customer identities, customer requirements and specifications, pricing strategies, estimating methodologies, bidding information, project data, vendor relationships, operational processes, and business plans.

113. Structis obtained independent economic value from this information that was not generally known or readily ascertainable to the public and has kept this information secured and confidential, especially from competitors.

114. Structis has expended substantial resources in developing its trade secrets and confidential information for its exclusive benefit.

115. Structis' trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by third-party competitors.

116. Structis has made reasonable efforts to protect the secrecy of its trade secrets, including, but not limited to:

- Requiring employees who will have access to trade secret or confidential information to sign nondisclosure, noncompetition, and nonsolicitation agreements, or to acknowledge confidentiality obligations as part of their employment terms;

- Requiring employees who will have access to trade secret or confidential information to sign nondisclosure, noncompetition, and nonsolicitation agreements, or to acknowledge confidentiality obligations as part of their employment terms;
- Storing confidential information on password-protected software and systems;
- Limiting access to certain confidential information on a "need to know" basis;
- Locked offices and physical security systems, including document and filing systems;
- Electronic and computer security measures including firewalls, encryption, and password protection protocols;
- Employees receive training regarding confidentiality obligations;
- Requiring employees to sign employee handbooks and company policies that include clauses regarding the confidentiality of Company information.

117. Defendants Pupke and Haidet knew that Structis' trade secrets were supposed to be kept confidential—as embodied by the Pupke Agreement and Haidet's offer letter, which they both signed. Additionally, Structis maintains company-wide confidentiality policies, and employees are required

to sign employee handbooks acknowledging confidentiality obligations regarding Company information.

118. Defendants Pupke and Haidet misappropriated Structis' trade secret information by disclosing and using this information to start and operate DNA Polymer during and after their employment with Structis.

119. DNA Polymer knew or had reason to know that Structis' trade secrets were improperly obtained by Defendants Pupke and Haidet—indeed, DNA Polymer is the very entity through which the misappropriation was carried out.

120. Defendants' misconduct was willful and malicious, as Defendants Pupke and Haidet acted as 'double agents' while employed by Structis, secretly forming a competing company and using Structis' trade secrets to build their competing business—all while lying to Structis management about their activities and collecting salaries and benefits from the very company they were betraying.

121. As a direct and proximate result of Defendants' misappropriation, Structis has suffered damages. Structis is entitled to damages, including exemplary damages and attorneys' fees because Defendants' actions were willful and malicious.

## COUNT VI — MISAPPROPRIATION OF TRADE SECRETS UNDER THE FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (Against All Defendants)

122. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

123. Structis possessed information of independent economic value that was lawfully owned by Structis and for which Structis took reasonable measures to keep such information secret. This trade secret information includes information pertaining to Structis' customer identities, customer requirements and specifications, pricing strategies, estimating methodologies, bidding information, project data, vendor relationships, operational processes, and business plans.

124. Structis obtained independent economic value from this information that was not generally known or readily ascertainable to the public and has kept this information secured and confidential, especially from competitors.

125. Structis' trade secrets were used or intended to be used in interstate and foreign commerce. Structis operates across multiple states, including Florida, Georgia, Alabama, and other southeastern states. Defendants' competitive activities have involved or affected interstate commerce, including projects in Georgia (e.g., the Hunter Army Airfield project

in Georgia), Florida, and other states in the Southeast where Structis has conducted business.

126. Structis has expended substantial resources in developing its trade secrets for its exclusive benefit. Structis' trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by third parties.

127. Structis has made reasonable efforts to protect the secrecy of its trade secrets, as set forth above.

128. Defendants Pupke and Haidet used and disclosed Structis' trade secret information to DNA Polymer and through DNA Polymer during and after their employment with Structis, despite their fiduciary and contractual duties to maintain its secrecy.

129. DNA Polymer conspired with Pupke and Haidet to misappropriate Structis' trade secrets.

130. When DNA Polymer acquired Structis' trade secrets through Pupke and Haidet, it knew or had reason to know that the trade secrets were acquired by improper means.

131. Defendants' misconduct was willful and malicious, as Pupke and Haidet were acting as double agents while employed by Structis, secretly forming a competing company and gaining access to confidential information for the express purpose of disclosing and using it to compete—all while making

affirmative misrepresentations to Structis management about their loyalty and intentions.

132. As a direct and proximate result of Defendants' misconduct, Structis has suffered damages. Structis is entitled to exemplary damages up to two times the amount of actual damages and attorneys' fees because Defendants' misappropriation was willful and malicious. 18 U.S.C. § 1836(b)(3). Structis is also entitled to an injunction to prevent any actual or threatened misappropriation.

**COUNT VII — VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**
**(Against Defendants Andrew Pupke and Daniel Haidet)**

133. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

134. Defendants Pupke and Haidet intentionally accessed Structis' protected computers and computer systems during their employment without authorization, or in excess of their authorized access, for the purpose of obtaining information from Structis' protected computers to further their competing business, DNA Polymer, and to further their personal interests, rather than for any legitimate Company purpose.

135. Defendants Pupke and Haidet exceeded their authorized access to Structis' computers by accessing confidential business information, customer data, pricing information, project data, and other trade secret information for

the purpose of using such information for the benefit of their competing venture, DNA Polymer, rather than for any authorized Company purpose. Defendants accessed Structis' computers and systems while pretending to lawfully access information for Company business while in reality accessing such information for their own self-interest and for DNA Polymer.

136. Additionally, Defendant Pupke installed and executed CCleaner—a program commonly used as an anti-forensics tool to wipe data and user activity from a computer—on his Company-issued laptop on or around July 21, 2025, during the period when he was actively planning and forming DNA Polymer. Pupke's use of this program was not authorized by the Company and was intended to destroy evidence of his unauthorized access to and misappropriation of Structis' confidential information and trade secrets from Structis' protected computer.

137. Through their unauthorized access and their access in excess of authorization, Defendants Pupke and Haidet obtained data from Structis' protected computers, including confidential business information and trade secrets.

138. As a direct and proximate result of Defendants Pupke and Haidet's misconduct, Defendants caused losses of $5,000 or more during a one-year span. Structis is thus entitled to damages, including compensatory damages,

costs of the forensic investigation, and such other and further relief as this Court deems just and proper.

**COUNT VIII — VIOLATION OF THE FLORIDA COMPUTER ABUSE AND DATA RECOVERY ACT (FLA. STAT. § 668.801 et seq.) (Against Defendants Andrew Pupke and Daniel Haidet)**

139. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

140. Defendants Pupke and Haidet knowingly and with intent to defraud and cause harm accessed Structis' password-protected computers and computer network and obtained information for the secret purpose of using it for DNA Polymer, without authorization or in excess of their authorized access.

141. Structis is the owner of the protected computers and the owner of the information stored within the protected computers that Defendants Pupke and Haidet unlawfully accessed. Structis uses such information in the operation of its business.

142. Defendants Pupke and Haidet knowingly and with intent to defraud accessed Structis' protected computers and exceeded their authorized access during their employment at Structis with intent to defraud Structis by pretending to lawfully access information for a proper purpose while in reality accessing such information for their own self-interest and for DNA Polymer. Defendant Pupke further installed and executed CCleaner, an anti-forensics

program, on his Company-issued laptop to destroy evidence of his unauthorized activities.

143. Structis' confidential information that Defendants Pupke and Haidet wrongfully accessed through Structis' password-protected computers extends beyond Structis' trade secrets and encompasses a much broader range of confidential data and knowledge.

144. As a direct and proximate result of Defendants Pupke and Haidet's misconduct, Structis has suffered damages. Structis is entitled to damages, as well as attorneys' fees, under the statute.

**COUNT IX — CIVIL THEFT (FLA. STAT. § 772.11)**
**(Against Defendant Andrew Pupke)**

145. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

146. Structis owned title to its property, including Company documents, files, records, customer data, project information, and other tangible and intangible property, and had a right to possess such property.

147. Defendant Pupke knowingly obtained or used, or endeavored to obtain or use, Structis' property—including Confidential Information and Materials, Company records, customer data, project information, pricing data, and business information—with felonious intent to, either temporarily or permanently, deprive Structis of its right to the property or its benefit, and to

appropriate such property for his own use and the use of DNA Polymer. Fla. Stat. § 812.014.

148. Structis demanded that Pupke return the Company's property. Pupke failed and refused to comply. In fact, Structis sent Pupke a pre-lawsuit demand under Fla. Stat. § 772.11(1) before filing the civil theft action, and more than thirty (30) days have passed without compliance. *See* Ex. F, cease-and-desist letter; Ex. G, pre-lawsuit demand.

149. In taking, retaining, and using Structis' property and refusing to return it, Defendant Pupke acted with criminal intent and with the intention of permanently depriving Structis of its property.

150. Defendant Pupke's actions go beyond and are independent of his failure to comply with the terms of his contractual agreements.

151. Defendant Pupke's actions were willful and malicious.

152. As a direct and proximate result of his misconduct, Structis has suffered damages. Pursuant to Fla. Stat. § 772.11, Structis is entitled to treble the actual damages sustained, so approximately $6,000,000.00 with the final amount to be determined at trial, together with reasonable attorneys' fees and court costs, and such other relief as the Court deems appropriate.

**COUNT X — CIVIL THEFT (FLA. STAT. § 772.11)**
**(Against Defendant Daniel Haidet)**

153. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

154. Structis owned title to its property, including Company documents, files, records, customer data, project information, scheduling and field operations information, and other tangible and intangible property, and had a right to possess such property.

155. As Division Manager, Haidet had access to and control over Structis' field operations, scheduling, project execution, and crew management information, as well as Structis' customer and project data.

156. Defendant Haidet knowingly obtained or used, or endeavored to obtain or use, Structis' property—including Confidential Information, Company records, customer data, project information, pricing data, scheduling and crew information, and business information—with felonious intent to, either temporarily or permanently, deprive Structis of its right to the property or its benefit, and to appropriate such property for his own use and the use of DNA Polymer. Fla. Stat. § 812.014.

157. Before filing this action, Structis satisfied the pre-lawsuit demand requirement of Fla. Stat. § 772.11(1) as to Haidet. On June 29, 2026, Structis' counsel delivered a written demand for $6,000,000 in treble damages to

Haidet's counsel, Ashwin Trehan, Esq., in correspondence that identified Haidet by name and addressed his conduct. After receiving this letter, Mr. Trehan confirmed in writing that he represents Haidet and is authorized to accept service on his behalf. More than thirty (30) days have passed since Haidet, through his counsel, received the demand, and Haidet has failed to comply with it. *See* Ex. G, pre-lawsuit demand.

158. In taking, retaining, and using Structis' property and refusing to return it, Defendant Haidet acted with criminal intent and with the intention of permanently depriving Structis of its property.

159. Defendant Haidet's actions go beyond and are independent of his failure to comply with the terms of his contractual obligations.

160. Defendant Haidet's actions were willful and malicious.

161. As a direct and proximate result of his misconduct, Structis has suffered damages. Pursuant to Fla. Stat. § 772.11, Structis is entitled to treble the actual damages sustained, in an amount to be determined at trial, together with reasonable attorneys' fees and court costs, and such other relief as the Court deems appropriate.

## COUNT XI — TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS
## (Against Defendants Daniel Haidet and DNA Polymer Flooring Inc.)

162. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

163. Structis had existing and prospective business relationships with its customers, potential customers, vendors, and employees, including valid employment agreements with Pupke and contracts with its field crew and other personnel.

164. Defendants Haidet and DNA Polymer knew of Structis' existing and prospective business relationships. Haidet, by virtue of his former position as Division Manager, had intimate knowledge of these relationships.

165. Defendants Haidet and DNA Polymer improperly, unjustifiably, and without permission knowingly and intentionally interfered with Structis' business relationships by, among other things:

a) Soliciting Structis customers and performing work for Structis customers, including David Nelson Construction Co. and DTI/Costco;

b) Soliciting and hiring Structis employees in violation of the Company's contractual relationships with those employees;

c) Diverting business opportunities from Structis; and

d) Inducing Pupke and other employees to breach their contractual agreements with Structis.

166. All Defendants acted purposefully with malice and with the specific intent to injure Structis and benefit themselves at Structis' expense. Defendants' actions were not justified by any legitimate business interest.

167. As a direct and proximate result of Defendants' tortious interference, Structis has suffered and continues to suffer monetary damages and irreparable harm.

**COUNT XII — UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**(Against All Defendants)**

168. Plaintiff re-alleges and incorporates by reference the prior allegations contained in all prior paragraphs as if fully set forth herein.

169. In the alternative and to the extent that any contractual claims are determined to be unenforceable, Defendants have been unjustly enriched at Structis' expense by virtue of their use of Structis' confidential information, customer relationships, vendor relationships, and employee relationships to build and operate a competing business.

170. Structis conferred a benefit on Defendants by, among other things, providing Defendants access to Structis' confidential information, trade secrets, customer relationships, and operational expertise, and by paying Defendants' salaries and bonuses during the period when Defendants were secretly competing with the Company.

171. Defendants accepted and retained such benefits with full knowledge that Structis expected them to honor their obligations to the Company.

172. It would be inequitable for Defendants to retain such benefits without compensating Structis.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Structis Construction Solutions Group, LLC respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally where applicable, and award the following relief:

A. Enter a permanent injunction requiring Defendants to:

(i) Immediately return and account for all of Structis' proprietary, confidential, or trade secret information that they possess or have transferred to any third party;

(ii) Return all forms of that information to Structis in all formats;

(iii) Cease using all Structis confidential information and trade secrets;

B. Enter a permanent injunction enjoining Defendants from:

(i) Using, retaining, or disclosing any of Structis' proprietary, confidential, or trade secret information;

(ii) Engaging in any competitive activity in violation of the Pupke Agreement;

(iii) Soliciting or servicing any Customer or Potential Customer of Structis as defined in the Pupke Agreement;

(iv) Soliciting, hiring, or retaining any employee, consultant, or contractor of Structis; and

(v) Destroying any evidence regarding any of the allegations in this Complaint;

C. Enter an order under 18 U.S.C. § 1836(b)(3)(A) against Defendants providing for injunctive relief to prevent any actual or threatened misappropriation;

D. Compensatory damages in an amount to be proven at trial, but believed to exceed $2,000,000;

E. Consequential damages;

F. Disgorgement of all profits earned by Defendants as a result of their wrongful conduct;

G. Exemplary damages pursuant to Fla. Stat. § 688.004(2) and 18 U.S.C. § 1836(b)(3)(C) for willful and malicious misappropriation;

H. Treble damages pursuant to Fla. Stat. § 772.11;

I. Damages pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, including compensatory damages, forensic investigation costs, and any other appropriate relief;

J. Damages, costs, and attorneys' fees pursuant to the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 et seq.;

K. Punitive damages pursuant to Fla. Stat. § 768.72, for which Plaintiff has a reasonable basis for requesting;

L. Reasonable attorneys' fees and costs pursuant to Fla. Stat. § 688.005, Fla. Stat. § 772.11, 18 U.S.C. § 1836(b)(3), and any other applicable authority;

M. Pre-judgment and post-judgment interest as allowed by law;

N. Forensic and investigation fees; and

O. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Structis demands a jury trial on all issues in this action.

Respectfully submitted,

October 26, 2026

By: */s/ J. Bret Morace*

J. Bret Morace
**Zelle LLP**
110 East Broward Blvd.
Suite 2000
Ft. Lauderdale, FL 33301
Tel: 786-693-2350
Fax: 612-336-9100

Jade B. Jorgenson* *(Lead Counsel)*
(Minnesota Bar No. 0397213; *pro hac vice motion forthcoming)*
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-4400

Krista Pikus McDonald*
(*Illinois Bar No. 6321301; Iowa Bar No. AT0016790; *pro hac vice motion forthcoming*)
**FREDRIKSON & BYRON, P.A.**
200 East 9th Street, Suite 305
Coralville, IA 52241-2241
Phone: (319) 849-4240
Facsimile: (515) 242-8950
kmcdonald@fredlaw.com
***Attorneys for Plaintiff***